The next case called for oral argument is in re of the Marriage of Bottom. Counsel, if every lady may proceed. Please. This appeal is about magic. It's about magic that happened in the courtroom and in the resulting order. There are four parts to this magic. First is the magical ungifting of land that was given to the husband and wife by the wife's mother. The second is the magical business valuation that was assigned to as part of a property disposition. The third was the magical math that resulted in imputed income for child support purposes. And the fourth was the magical illusion of non-cooperation between the parties that denied the entry of an order of joint parenting. When we get these cases, they're a mess of entanglements. And hopefully during the process of the trial or negotiations, these are sorted through. But we do have certain guidelines we run by. So with regard to the magical ungifting, in this case it's a particular problem because there are two things at work. One, in 2008 there was no question that land, farmland we call it in the appeal, was given to the husband and wife, to Linda and Brian. All the paperwork designated that. It was given to them. After that time, they treated it as though it was their own property. There was nothing that they could not have done with it. It was something that had been done similarly with a sibling of the wife's, that she and her husband were doing the property. Thereafter, they acted in all fashion as though it was their property. And there was no question that it was their property. However, at trial, all of a sudden there was this ungifting of it in which there was an attempt to say this really wasn't a gift to husband and wife or our daughter and son-in-law. It was just a gift to my daughter. And the problem with that at that time is it contradicts every common sense application of it and is tantamount to buyer's remorse. It's gifter's remorse. They may have regretted it at the time of trial when there's a divorce going on. But clearly at the time it was given, when the intent should be analyzed, it was very clear. As a matter of fact, the mother testified that she could, if she'd chosen to, make it clear that it was a gift to her daughter. Only she could have put her daughter's name on it. She knew it at the time. And yet she intended at that time to give it to both of them. And that's exactly what she did. That's all the transfer papers. And that's not indisputable. What happens is that there's a subsequent attempt to recapture that moment and say I really didn't mean that now that there's a divorce going on. And by doing this it creates a problem in how the property was allocated. Suddenly the claim became it's my gift received during marriage instead of our gift received during marriage. One presumption is raised that any property acquired during marriage is marital. The second presumption that's raised is any property that's received as a sole gift during marriage is presumptively non-marital. You've got to prove it. So there are these two presumptions at work. In this case both presumptions. Is there a third presumption at work here that when a property is gifted to both the daughter and the son-in-law that there's a presumption of a gift to the son-in-law? Presumption of a gift to both, yeah. And what would you say is the burden of proof to rebut that presumption? Clear and convincing as it would be for the other presumption which is the acquisition of property during the marriage. If we're going to take it out of the pot. Did the court apply the clear and convincing or did the court apply preponderance? They applied preponderance. What they found was that the testimony of the mother was credible. And then later said that they found by preponderance of the evidence that it was a gift only to the daughter. And the problem with it is even with that finding I think it's not supported by the evidence. Obviously we have to give great deference to the trial court in certain aspects. But I think there was a misapplication of the law because at one point there's a discussion in the court's decision that says these are conflicting presumptions and they just neutralize each other. So there is no presumption either way. In fact, I mean, we're going into trial with a document that says it's given to both. It was given to four years before trial and there was never any kind of complaint. And the history of the case in the testimony shows that it was similarly given to siblings of the wife and the son and the husband. And they sold them. They sold them and they could do whatever they wanted. There was nothing preventing them from aliegating the property in any way. And in fact, so what the court had come up with was this conflicting presumptions and said they were neutralized, thereby creating a non-marital award to the wife only on the presumption of preponderance of evidence and solely on the fact that the court found that the mother's testimony was credible. Going to the next phase of it, and this is the second part of this magic, there was a magical business valuation that was never created in the evidence. It said it was a substantial asset. The husband worked as a self-employed landscaper. The itemization of all of the equipment was given. It was presented in the tax return. The valuation of it was made available to the court. And even a year before the testimony took place in the trial, there was a net value of the equipment of about $15,000 to $16,000. There was a debt associated with the business because he had been sued and defaulted on a job that he didn't perform. But that was a marital business and that was a marital debt. The court assigned that debt to him as well, but did it in two ways. They said, I'm going to give you the debt, but didn't factor it in as part of the value of his business. And he said, I'm going to instead give this substantial asset to the wife, which was her pension. It was a marital pension. There's no dispute about it, and it was given solely to the wife, saying, you take the business with the debt. That valuation is nowhere to be supported as being a substantial asset. Again, it's a high burden on appeal, and this is an abuse of discretion by the court. But in this case, what happened is we had a wife who was making $50,000 a year and a husband who was making substantially less and was self-employed. She was given not only the farmland, which was the biggest asset in the marriage. She was given her pension, the entirety of the marital pension. She was also given a judgment against the husband. She was given vehicles. The husband was given a vehicle. It was double-counted. It was given to him as personal property allocation, but it was also listed as an asset of the business. So, in effect, what he was given was an illusion. He came out of it with virtually nothing but the business, which there was no appraisal showing anything above and beyond the equipment, the liabilities, and that's it. There was no goodwill. There was no other valuation to it, partially because it was a business venture that they knew he was involved in. And this goes to the next part, is on the math and imputing income. During the marriage, they decided together in this uncontroverted that he would try to do this on his own and do this business. The wife supported him in his endeavor to do this, and it was something he continued to do during the marriage and during the divorce. At some point, they argue that he is underemployed, and they apply this factor for imputing income. Well, the underemployment is not the same thing as what they intended it to be, and they support it. I gave the factors in there of Gosling, which basically say that they have three factors they have to apply, that he is voluntarily unemployed. Unemployed, not underemployed, that he's attempting to evade a support obligation, and that he's unreasonably failing to take advantage of an employment opportunity. Wasn't there a time when he did attempt to evade a support obligation? I don't believe that there was an attempt to avoid a support obligation, especially related to his work. No, for the child. I beg your pardon? For the child. For the child. Did he make all support payments? I'm not sure if he was behind or not. It's possible he could have been behind, but that was not an attempt to avoid or evade the support obligation. It's because a lot of times the work was seasonal. The work that he did was tied into a seasonal employment. But he was a fairly educated guy who could have gotten another job on the off-season. I don't know that he had become fairly educated. I'm not sure of his – right now, I couldn't tell you his level of education. I know the wife had had an advanced education. He'd previously worked in an architectural firm, but I'm not sure that his level of education was that. I thought he may have been doing some draft work. Because it seems that when he was employed in a traditional sense, he could earn $50,000 a year. And that was before they both decided he should try it on his own. And that job was really not available to him anymore, and that's being out of that field for – And he'd been in this architecture with her approval, this landscaping business, for a substantial amount of time. Even then, the fact that he could get another job doesn't activate the factors under the Gosling case, which says, you know, he's not unemployed, first of all. And it may be frustrating to people who say, gosh darn it, I wish you would get a job and make more money. But that's not the standard that we go by. But there is a standard that if he is attempting to avoid paying a support obligation, that would be a Gosling standard. The third one is that he has unreasonably failed to take advantage of the employment opportunity. There is no employment opportunity that – first of all, there's none of that in evidence. And second, there's nothing to show that he avoided that. And that was something that they thought one day might take off, and it's not unusual people are self-employed. But in a lot of times, we begin to get hopes that that business will pay off in the end. And I think that's what we – As I recall, though, there is an allegation in the petitioner's brief that at some point she did back support his remaining underemployed or not succeeding in the landscaping business. So while initially it was supported, at some point it was not. I have no doubt that at the time the divorce proceedings were either imminent or in action that she didn't want him to do that anymore. But it doesn't go to his lack of effort to do it. It may go to her changed mind. She's changed her mind because she's looking at it differently. Instead of supporting him in this endeavor, she wants to get something from him, and she's no longer willing to invest in it. But her change of heart doesn't mean it wasn't a good faith effort to become self-employed and to have a business and be successful. There's no evidence that he's ever turned down work or ever tried not to be successful in this endeavor. And at some point, especially in the beginning, he thought that this would turn out. Again, he's trying to recreate history a little bit on her part, just like it was before her mother saying, I really – I didn't give that to them. I'm ungifting it to him. It's a remorse that occurs sometimes when people are getting a divorce and not happy anymore, but it doesn't mean that she didn't support it. The final one, as it relates to – there's this – somehow this illusion these parties didn't belong together such that they could cooperate for the purpose of joint parenting. You don't have to like your ex to be able to co-parent with them. You don't have to agree. As a matter of fact, the statute provides that that's not one of the factors and actually specifically says the ability of the parents to cooperate with each other in matters that don't relate to the child shouldn't affect their ability to co-parent. In this case, it was clearly a dominance. The wife clearly dominated the issue partially because she was in education. So one example is when they go to these parent-teacher conferences, what was characterized as him not being involved was him deferring to what he thought were the right questions. He didn't try to act like he was left out. He listened and he participated. He participated whenever he could. And the only change of heart that occurred occurred after there was pleadings filed by him concerned about someone that she was bringing around the children who had had some allegations in the past. And after that point, then somehow the joint parenting, the lack of cooperation, the inability to parent was raised as an issue. Although there's no example of them not being able to co-parent, which is a preferred method to keep it as natural as possible for the children. The only statements basically were, the findings were, that she was more involved than he was. Well, that's fine. That's okay. And then you can still co-parent and be involved in it. And you can still defer to the other person's opinion, still be a party to co-parenting. Those are the reasons that we believe that the order was in error. There are other things that we disagree with. I think that there's really, we don't have anything to say about it. I think the court had the authority to make a lot of these decisions. It's on these four points that we feel that they either failed to consider the evidence and it was against the manifest way of the evidence, or it was an abuse of discretion. And in some cases, in the first, I made it, part of it I believe was a request of de novo review because of the judge's application of the conflicting presumptions. So we're asking that those items, that the court reverse the trial court on those items and they be remanded with instruction. Thank you. Thank you, counsel. Counsel? Justice Gould's attorney, Justice Chaffin, and Justice Cates. My name is Jennifer Shaw and I represent Linda Bottom, the petitioner appellee in this matter. Mr. Fahrenkamp and his client hold the burden of proving the trial court's rulings were against the manifest way of the evidence on all four issues that he raised today and that he raised in his brief. He failed to do so and the judgment of the trial court should be affirmed. As this court is very well aware, when the standard of review is manifest way or abuse of discretion, in where the marriage of divilbis holds that evidence adduced at trial is to be viewed in the light most favorable to the appellee. And the appellate court will and shall affirm if there is any basis to support the trial court's findings. And that's exactly the case here. Nothing about the things that happened in the trial court were magical. This was a straightforward family case. The first issue addressed in both of our briefs is the issue of the farm ground. And the farm ground was properly classified as non-marital. The marriage of Gerda speaks to the trial court's property classification and the appellate court is not to disturb the classification of marital property unless it is against the manifest way of the evidence. So that's our standard here. The classification of property is manifest way of the evidence. Section 503 of the Illinois Marriage and Dissolution of Marriage Act states that all property acquired during the marriage is marital, regardless of how title is held. And I think that's really important language, regardless of how title is held. It then goes on to state exceptions to marital property, those items that are non-marital. And nowhere does it say that the, regardless of how title is held, shifts. Regardless of title is held, stays a part of the court's determination as to whether it's marital or non-marital. So whether the deed was held in joint names or in sole names, we have conflicting presumptions here. There's a presumption that because the property was gifted during the marriage, it is marital. There is also a presumption that because this transfer was to a child from a parent, that it's a non-marital transfer. In those cases where there are conflicting presumptions, they cancel each other out. And the trial court is free to classify the property by preponderance of the evidence standard. And what case do you rely on for that? For that proposition, the canceling out and the preponderance. And I have just a moment, Your Honor. Sure. Thank you. That would be In re, the marriage, and pardon my pronunciation, Hagenus, 600 Northeast, 2nd, 437, and In re, the marriage, 1st Street. 1st Street is a 5th District case decided in 2006. And it specifically says, quote, In cases where a determination of the nature of the property at issue was found to be subject to these conflicting presumptions, the presumptions are considered to cancel each other out, and a simple manifest way to the evidence standard is applied. That is, the presumption of a gift to a child is canceled out by the conflicting presumption that all property acquired after the marriage is marital property. And thus, the trial court is free to determine the issue of whether the asset in question was marital or non-marital property without resort to the presumptions. That was also followed by In re, the marriage of Didier and In re, the marriage of Hagenus. And again, I apologize for my pronunciation. Mr. Fahrenkamp, in his brief, cites the marriage of Kendra. This case is distinguishable. I addressed that in my brief. I will have done that only briefly. Again, those cases are so factually distinguishable. In this case, the donor, Marilyn Napier, testified that this property had been held in her family for generations. She gifted property to her daughter as an advance on the inheritance to both Linda, my client, and Nicholas, her grandson. And my brief cites to the portions of the record where she testifies to that. So it's a gift, but it's a contingent gift on them remaining married. No, that's not what she testified to. She testified that when she made the gift, this was the understanding, that this was to be Linda's property. In Kendra, the property was purchased. Three parcels were purchased. And at that time, the property was placed in the names of the children and the parents. There was no time between that. And the donor testified that the reason the property was placed in the name of the children was so that they could obtain free hunting licenses so that they would have a place to hunt. And so it's completely distinguishable from testimony here. I think that Mr. Fancamp is an extraordinarily seasoned litigator. His ability to cross-examine is phenomenal. I'm sure that his reputation for cross-examination precedes him. And Linda Nagle stood up to his cross-examination. He had every opportunity to ask her questions and to impeach her testimony. And yet at the end, the Honorable David Grounds found that Marilyn's testimony was in fact credible and that she is the one who gifted to Linda. I think it's important to note that the trial court is in a superior position to judge the credibility of the witnesses. I think that's well said of law in Illinois. And again, Judge Grounds specifically found Linda Napier's testimony as to her intent at the time of the transfer and at the time of the trial as donative intent only to Linda. With respect to the personal property distribution, I believe that if you look at my brief on page 16, there is a chart that enumerates the allocation of property and debt. There is no dispute as to what the debts of the marriage are. And I believe, Justice Page, you asked questions about avoiding child support. And in many ways, I think we can make that argument. Linda Bottom is the one who provided all of the children's health insurance, all of their orthodontic bills, all of the bills for them during the pendency of these proceedings. Mr. Bottom testified, in fact, that he couldn't afford to contribute to any of those bills. At the end of the day, the trial court found that Mr. Bottom had responsibility for some of those bills, but allocated all of the debt of the marriage, including the very large $48,000 judgment against Design Tech to my client. So when we walk away and walk out of the courtroom after this decision, Mr. Bottom walks out with Design Tech, which has a value that the court can establish because we have tax returns. And it's somewhere between $15,000 and $40,000. You ask, where is the discrepancy? The trial court considered the fact that depreciation was taken on those schedules. And it's also well set a law that something that can be taken as depreciation for the IRS may or may not calculate into the value of an asset at the time of distribution. So even assuming the low figure of $15,000, he walks away with $15,000 and zero debt. Linda walks away with a $49,000 pension and $128,660 worth of debt. The trial court's division doesn't have to be 50-50. It's well set a law in Illinois that it just has to be an equitable distribution. Clearly, if we look at equity, Mr. Bottom is the one who walks away with a more equitable distribution. He has zero responsibility for any of the debts. With respect to child support, there is no evidence whatsoever in the record that there was not the availability of continued employment for Mr. Bottom as an architectural draftsman. Mr. Fahrenkamp raised that in his brief. I raised that in my brief. The record is completely devoid of any testimony indicating that Mr. Bottom could not continue on as an architectural draftsman. In addition, while it was originally the agreement of the parties that Mr. Bottom attempt to start his own business, at the time of the agreement, and there is testimony in the record, my brief cites to that testimony, Linda said, I want you to try it, and this is paraphrasing, but if it doesn't work, I want you to go back to a regular job. I want you to go back to being a W-2 employee. And so when Mr. Fahrenkamp says that there was no employment available, Mr. Bottom didn't look. That is also cited here in the record. And I believe that you also asked questions about whether or not Mr. Bottom was behind in support. He is behind in support. There has been no support paid. Once again, the standard is banned because of the evidence. The determination of the trial court's trial support calculation should not be disturbed unless it's an abuse of discretion. We urge the Fifth District to adopt the holding held in suite that, and I quote, a party must make a good faith effort to earn sufficient income or the court may set support at a higher level appropriate to the skills and or experience of the obligor. Simply stated, underemployment would become a factor in the Fifth District for deviation. The Fourth District has already adopted this position in suite. I think this is something that we see all the time in family cases, particularly with self-employed individuals. I think this court is very well aware of the fact that it's easy to hide money when you're self-employed. But at the end of the day, when we look at what the actual deviation was, Mr. Bottom's financial statement indicated that he grossed $33,000 per year. The trial court imputed income to him of $39,000 a year, a $6,000 difference. We ask that the court impute a difference of, impute $50,000 worth of income. This represents $100 a month difference in child support. That's it. We're talking about $100 a month here. And this is a guy who was ordered to pay $600 a month for two children. When we go back and we look at suite, the trial judge in suite came down very hard on the obligor and said, you may have a right to be self-employed, but your children shouldn't suffer as a result of it. And that's exactly what's happening here. Mr. Bottom is self-employed, but his children are suffering as a result of it. Finally, with respect to custody. Ms. Shaw, did he voluntarily leave his draftsmanship job? He did. He did. Finally, with respect to custody, again, the record is very clear, and it supports an award of full custody. We talk extensively in our brief about the law. Mr. Faircamp does not do so. He does not give you any authority by which to reverse. It is very, very clear in the state of Illinois that in custody decisions, the trial court is given great deference because he or she is the person who is listening to, watching, seeing the demeanor, hearing the way people testify. And unlike Mr. Faircamp's statement, the trial court really didn't explain its decision. I take umbrage with that. The trial court decided that full custody was appropriate, as I set forth on pages 26 and 27 of my brief, because Brian made only limited contributions to the decisions impacting the children's health, educational welfare. He lacked requisite knowledge of medical care and providers. He lacked requisite knowledge of Nick's underlying learning disability and the remedial actions that were necessary to help Nick continue to succeed. She, being Linda, was exclusively responsible for the medical care for the children. And, in fact, Mr. Bottom just chose not to pay for the orthodontia bill, even though he had agreed to do so. And Mr. Bottom didn't attend either of Nicholas's extracurricular activities. It seems to me, though, that the judge gave a lot of time in visitation. He did. And the judge was not concerned about the parenting at all. So I'm confused as to why he didn't give joint custody in light of the amount of visitation. Sure, there was a substantial amount. The visitation that was granted was exactly the visitation that the parties had agreed to between the two of them. And that concerns me. It doesn't concern me. But the fact that the parties could agree and that they allotted so much visitation would weigh against sole custody. In fact, both parties wavered as to whether or not joint or sole custody was appropriate. That's cited here in our brief and in the record. The reality of the matter is that Madison County, we can't get a temporary hearing. I don't know if that's made its way to this court or not. It's not a part of the record. We don't get temporary hearings. At the time that this case came up, you either make an agreement or you don't. And that's changing now. But we've had to pretty much pull ourselves up by our bootstraps and jam something down our clients' throats to make sure that kids are seeing both parents because we haven't been able to get a temporary hearing. But there's been no problem in the exchange of the children or anything like that? Unfortunately, the record is devoid of the problems that have occurred since then. Visitation is awarded but does not occur the way that it is cited in the order. In fact, Mr. Bottom sees the children approximately once a month. He does not take all of his time. And there is substantial testimony in the record that even though this had been the agreement, he didn't take all of his time. He didn't take his Tuesdays. He didn't take all that time. So just because that was an agreement, part of those negotiations when we deal with family is give him something, we know he's not going to take it. And that's exactly what happened here. Thank you, Your Honors. Thank you, Counsel. Counsel? If Linda had died before the divorce was filed, the farmland would have gone to my client. There's no doubt about it. If the parents had intended to create some sort of conditional award of property, they would have done it a different way. They didn't. The only reason we're talking about marital and non-marital property is that that's a special creature the legislature has created that starts from the filing of the divorce and ends at the end of the divorce. Up until that time, the divorce was filed. They didn't show any concern. They didn't create a trust. They didn't do anything to keep it solely in the family. As a matter of fact, keeping it solely in the family meant nothing because their other child's testimony was so cool. So the whole idea behind this mythical, magical, oh, this was a gift to her only, isn't in existence. If she had died before the divorce was filed, Brian would have gotten the property. And so that idea of keeping it from Brian doesn't ring true. It doesn't pass the smell test. With regard to the debt was assigned to Linda, that's really not what the order said. As a matter of fact, the judge gave the $48,000 debt to Brian at page C-128 of the record, but at A-3 in the appendix, Brian is awarded the assets and the liabilities of design tech, and he shall hold Linda harmless and indemnified therefrom. And that's including the $48,000 judgment that was against Brian. Then later, the court says that Brian owes Linda the sum of $62,000. Well, you know what that is? That's the $48,000 that he's supposed to indemnify. So he doesn't get any of the property, any pension, anything, because he's paying that debt presumably to her, which is a marital debt. They don't say anything about what the value of that farmland is. The farmland has substantial value. With regard to them getting along or not getting along, they agreed. And despite any comments that things that aren't on the record, they agreed and they came to a conclusion. We do it every day. It's not something the court impressed upon us because of a lack of temporary. We do this every day. We are in the trenches, and we are working like and getting things done that ought to be done. If this wasn't working, if they couldn't cooperate, I can guarantee that Ms. Shaw never would have agreed to it because she protects her clients, and I never would have agreed to it. We're trying to get people past a difficult part in their life, and when they get past it, have them no longer need us, hopefully. And that's what that was designed to do. And whether they exercise it all or not now, or whether it's her fault or his fault, isn't really something that's appropriate for us to discuss now. That's something for post-judgment matters and not today. But they agreed on it, and they made agreements, and they agreed throughout on all this. They were able to do it, and they did. Any time it came to the children, they were able to agree. Thank you. Thank you, counsel. We appreciate the briefs and arguments. Counsel will take the case under advisory. Thank you.